## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | |
|---|---|
| GREAT AMERICAN INSURANCE COMPANY, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) CIVIL ACTION 22-0002-WS-B ) |
| POWERSOUTH ENERGY COOPERATIVE, et al., | ) ) ) |
| Defendants. | ) ) |

## ORDER

This matter is before the Court on motions to dismiss filed by the two defendants. (Docs. 18, 19). The parties have filed briefs in support of their respective positions, (Docs. 22, 29, 30), and the motions are ripe for resolution. After careful consideration, the Court concludes the motions are due to be denied.

## BACKGROUND

According to the amended complaint, (Doc. 14), a non-party ("TEC") performed work for defendant PowerSouth Energy Cooperative ("PowerSouth"), in the course of which work TEC's employee ("Kelly") was injured. Kelly sued PowerSouth in state court. (*Id*. at 2, 6).

A non-party ("State Auto") was TEC's insurer under a commercial general liability ("CGL") policy. State Auto defended PowerSouth as an additional insured under this policy. Defendant Liberty Mutual Fire Insurance Company ("Liberty") provided PowerSouth with CGL coverage on a primary basis, with policy limits of $25 million per occurrence and a self-insured retention of $350,000. The plaintiff issued an umbrella policy to TEC, under which PowerSouth claimed to be an additional insured. (Doc. 14 at 2-3, 7-8, 13).

Trial of the Kelly lawsuit was specially set for August 23, 2021. On August 16, 2021, State Auto tendered its policy limits of $1 million in partial settlement of the lawsuit. On August 19, 2021, the plaintiff paid an additional $1 million in full settlement of the Kelly lawsuit. (Doc. 14 at 3-4).

In this action, the plaintiff seeks: (1) a declaration that it has no indemnity obligation with respect to the Kelly lawsuit; (2) a declaration that its policy is excess to that of Liberty or, in the alternative, that the two policies apply *pro rata* by limits; and (3) recovery from the defendants of the $1 million the plaintiff paid to settle the Kelly lawsuit. (Doc. 14 at 4, 15-16). The latter relief is sought under theories of equitable subrogation, contractual subrogation, and contribution. (*Id*. at 17-23).

## DISCUSSION

The primary argument advanced by the defendants is that the plaintiff's claims are barred by Alabama's "voluntary payment doctrine." PowerSouth also argues that the plaintiff's subrogation claims against it are not viable.

### A. Voluntary Payment Doctrine.

"It has been the law in Alabama for over 150 years that where one party, with full knowledge of all the facts, voluntarily pays money to satisfy the colorable legal demand of another, no action will lie to recover such a voluntary payment, in the absence of fraud, duress, or extortion." *Mt. Airy Insurance Co. v. Doe Law Firm*, 668 So. 2d 534, 537 (Ala. 1995). The defendants acknowledge this as a correct statement of the doctrine. (Doc. 12 at 3; Doc. 18 at 4; Doc. 19 at 3). The plaintiff advances a number of reasons it believes the doctrine does not apply here, but the Court finds one dispositive for present purposes.

The amended complaint alleges that the plaintiff made its payment "absent full knowledge of all facts." (Doc. 14 at 9). In particular, and despite multiple requests from the plaintiff, the defendants refused to provide the plaintiff access to

2

the Liberty policy and similarly refused to provide the plaintiff with requested information and documents regarding the Kelly action. (*Id*. at 9, 13-14). The plaintiff argues that the defendants' stonewalling precluded it from knowledgeably evaluating its exposure vis-à-vis the Liberty policy (which depends on policy language, including its "other insurance" provision) and from knowledgeably evaluating probable outcomes of the Kelly trial. (Doc. 22 at 8-9).

On motion to dismiss, the Court must accept the amended complaint's allegations regarding the defendants' conduct and the information they refused to provide the plaintiff; the defendants do not argue otherwise. Nor do they suggest that the plaintiff, before it made payment, had obtained the denied information from other sources. Instead, the defendants argue that, despite their refusal to provide information or documents, the plaintiff had all the knowledge that *Mt. Airy* requires.[1]

The defendants begin with the proposition that "full knowledge of all the facts" cannot mean "omniscience" or "all knowledge." (Doc. 19 at 5; Doc. 30 at 10). That may be true, but it does not answer the question of how much knowledge, of what facts, is required in order to implicate the voluntary payment doctrine. As the parties seeking dismissal, it is up to the defendants to satisfactorily answer that question, and simply saying what the answer *is not* does not establish what the answer *is*.

Because the parties do so, the Court focuses on the contents of the Liberty policy. The defendants insist the plaintiff had "full knowledge of all the facts" because it knew that a Liberty policy existed and thus knew it was "possible" the Liberty policy "could" be primary. (Doc. 18 at 1-2; Doc. 19 at 3, 6; Doc. 29 at 14; Doc. 30 at 10). The existence of the Liberty policy is certainly a fact, but the

---

[1] The defendants' breezy confidence is difficult to square with PowerSouth's admission that "it is unclear from that case [*Mt. Airy*] which of the many categories of facts and knowledge this language ["full knowledge of all the facts"] refers to." (Doc. 19 at 5).

defendants do not explain how it could be "all the facts" for purposes of *Mt. Airy*. Nor do they explain how the plaintiff's awareness that the Liberty policy "could" "possibl[y]" be primary could constitute "full knowledge" that the Liberty policy was (or was not) in fact primary.

Liberty objects that the plaintiff identifies no "unknown fact that it later discovered." (Doc. 30 at 10). In the context of the Liberty policy, however, the plaintiff identifies the unknown fact as the policy language, on which language the primacy determination depends. It is true that the plaintiff has yet to discover that language (because the defendants continue to withhold it), but Liberty does not show that *Mt. Airy* or any other case requires such post-payment discovery of the previously unknown information before a suit for reimbursement may be filed. Nor has Liberty identified any legal or equitable principle that would entitle it to withhold such information and then profit from its own recalcitrance by demanding dismissal of a reimbursement action prior to formal discovery of the withheld information.

PowerSouth says the plaintiff "is unable to articulate what additional information it needed to know about the terms of Liberty Mutual's policy." (Doc. 29 at 14). As noted above, however, the plaintiff has explained that the interplay between its policy and Liberty's depends on policy language, including the policies' "other insurance" provisions. (Doc. 22 at 9). Neither defendant denies that this is a correct statement.

PowerSouth argues that the plaintiff's bringing of this action without having been provided the Liberty policy proves the plaintiff did not need the policy in order to satisfy *Mt. Airy*. (Doc. 19 at 6). This is a *non sequitur*, as the language and purpose of Rule 11(b) are vastly different from those of the *Mt. Airy* test. As for purpose, a complaint simply makes an allegation to be proved later, while *Mt. Airy* establishes when a financial payment is irretrievable. As for language, "information and belief" under Rule 11(b) is a far lower standard than "full knowledge of all the facts" under *Mt. Airy*.

4

PowerSouth notes that, while "it is well settled that money voluntarily paid under a mistake of fact may be recovered, even where the party paying had means of ascertaining the real facts," it is "equally well settled that money voluntarily paid with full knowledge of the facts but by reason of mistake of law cannot be recovered." *U-Haul Co. v. Johnson*, 893 So. 2d 307, 311-12 (Ala. 2004) (internal quotes omitted). (Doc. 19 at 5-6). According to Liberty, a mistake of fact occurs only when a party "*didn't know* it didn't have full knowledge." (Doc. 30 at 10-11 (emphasis in original)). Here, Liberty continues, the plaintiff knew it did not know what the language of the Liberty policy said, and it thus paid the settlement "knowing it did not have all the facts." (*Id*. at 10 (emphasis omitted)).

As this Court has repeated many times, "[d]istrict courts, including this one, ordinarily do not consider arguments raised for the first time on reply." *Scott v. ILA Local 140 International Longshoremen's Association*, 449 F. Supp. 3d 1270, 1273 (S.D. Ala. 2020) (internal quotes omitted). Liberty made no reference to mistake of fact in its principal brief, first injecting the argument in its reply.[2] Liberty has offered no excuse for not raising this argument in its principal brief and no reason the Court should consider it now. The Court therefore declines to do so.[3]

PowerSouth notes that the plaintiff raises a coverage defense that is independent of Liberty's policy – that PowerSouth is not an additional insured under the plaintiff's policy. (Doc. 19 at 6). PowerSouth's point is obscure, but even if the plaintiff had "full knowledge of all the facts" regarding that potential

---

[2] While PowerSouth mentioned "mistake of fact" in its principal brief, it made no argument based on that doctrine. (Doc. 19 at 5-6).

[3] Even had the argument been timely raised, the defendants have not shown it to be meritorious. A mistake of fact would certainly be sufficient to avoid the voluntary payment doctrine, because it would mean the payor did not have (even though he thought he did have) "full knowledge of all the facts" under the *Mt. Airy* formulation. But the defendants have not demonstrated that the quoted language, which is facially quite broad, is confined to mistaken facts to the exclusion of unknown facts.

defense, it would not impact the plaintiff's lack of full knowledge of all the facts regarding its defenses based on the Liberty policy.

Finally, PowerSouth insists that what the payor must have full knowledge of is "'that the claim is unjust.'"  (Doc. 19 at 5 (quoting *Town Council of Cahaba v. Burnett*, 34 Ala. 400 (1859))).  This argument actually seals the deal for the plaintiff, since the defendants do not explain how the plaintiff could have had full knowledge that the defendants were responsible for any payment above the $1 million funded by State Auto (making the defendants' insistence to the contrary unjust) when they withheld from the plaintiff the policy on whose language that assessment depends.

The defendants' tactics, which the amended complaint describes as deliberately undertaken, had the predictable and natural effect of initiating a high-stakes game of chicken.  Denied by the defendants of the basic and easily shared information that was the Liberty policy, and confronted with the defendants' adamant refusal to participate in a settlement, the plaintiff had two unappealing choices on the eve of trial.  First, it could sit tight and risk a massive verdict followed by a post-verdict discovery that Liberty's policy was not primary, leaving the plaintiff with full responsibility for the verdict if its coverage arguments failed.  Second, the plaintiff could cap its potential loss by settling with Kelly and seek to recover some or all of that payment from the defendants.  Not surprisingly, the plaintiff selected the latter option.

It is unnecessary to speculate whether the defendants, by withholding the Liberty policy, purposefully intended to box the plaintiff into this corner and thereby pressure the plaintiff into settling the case without their involvement.  Nor it is necessary to speculate whether they engaged in such conduct with the expectation of avoiding all liability by invoking the voluntary payment doctrine.  The Court describes the situation only to highlight its potential for gamesmanship and the unlikelihood the Alabama Supreme Court would approve of it by placing

the content of competing insurance policies outside the ambit of "full knowledge of all the facts."

The defendants have identified no case applying the voluntary payment doctrine under circumstances remotely resembling those of this case, and they have presented no authority or reasoned argument that would justify stretching the doctrine to the circumstances alleged in the amended complaint. The defendants therefore have failed to show themselves entitled to dismissal pursuant to that doctrine.

### B. Subrogation.

Counts Three and Four assert claims against both defendants for equitable and contractual subrogation. (Doc. 14 at 17-21). Liberty does not challenge these claims other than under the voluntary payment doctrine, but PowerSouth argues that the plaintiff "cannot subrogate against PowerSouth." (Doc. 19 at 7).

According to PowerSouth, "'[n]o right of subrogation can arise in favor of the insurer against its own insured.'" (Doc. 19 at 8 (quoting *Moring v. State Farm Mutual Automobile Insurance Co.*, 426 So. 2d 810, 812 (Ala. 1982)). The plaintiff, however, has not conceded that PowerSouth is its insured. The amended complaint repeatedly alleges that PowerSouth merely "claim[s]" or "purport[s]" to be an additional insured. (Doc. 14 at 3, 8, 18). As PowerSouth recognizes, by this language the plaintiff "asserts PowerSouth is not an additional insured under its policy." (Doc. 19 at 6 n.1). On motion to dismiss, that allegation must be accepted as true, precluding PowerSouth's successful reliance on *Moring*.

According to PowerSouth, *Mt. Airy* stands for the proposition that the only situation in which subrogation is legally permissible arises when the insurer makes payment to its insured for injuries caused by a third party. (Doc. 19 at 8). *Mt. Airy* may so limit the doctrine when an insurer and its insured are both involved (as was the case in *Mt. Airy*), but it does not address the availability or scope of subrogation when (as the plaintiff asserts here) there is no insurer-insured

relationship. Simply quoting *Mt. Airy*, which is all PowerSouth does, fails to rule out other applications of the doctrine.[4]

In its reply brief, PowerSouth advances a new subrogation argument: that subrogation works by allowing the payor to "stand in the shoes" of another and pursue their rights against a wrongdoer, and that the plaintiff is nonsensically attempting to stand in PowerSouth's shoes to pursue PowerSouth's rights against PowerSouth. (Doc. 29 at 3-4). PowerSouth continues that the plaintiff cannot stand in TEC's shoes, either. (*Id*. at 4). As noted in Part A, the Court does not, without excellent excuse, permit movants to prevail based on arguments withheld until their reply brief.[5] Because PowerSouth offers no excuse at all, the Court declines to consider its tardy argument.

## CONCLUSION

For the reasons set forth above, the defendants' motions to dismiss are **denied**.

DONE and ORDERED this 27th day of June, 2022.

s/ WILLIAM H. STEELE
UNITED STATES DISTRICT JUDGE

---

[4] The Alabama Supreme Court has described subrogation generally as "an equitable doctrine the purpose of which is to provide for a proper allocation of payment responsibility [by] impos[ing] ultimate responsibility for a wrong or loss on the party who, in equity and good conscience, ought to bear it." *Ex parte State Farm Mutual Automobile Insurance Co*., 118 So. 3d 699, 704 (Ala. 2012). The doctrine does not apply exclusively in the insurance context. Black's Law Dictionary 1563-64 (9th ed. 2009).

[5] Counts Three and Four explicitly alleged that the plaintiff was equitably and contractually subrogated to the rights "of PowerSouth and/or TEC." (Doc. 14 at 17, 20).